Automated Creel Systems Before you begin counsel, Judge Moore told me I could say oh what a tangled web we weave. When first we practiced, too deceived. I didn't endorse it. Mr. Kodesh, I'm sorry, did I get your name right? Please proceed. I would like to focus my remarks on two errors committed by the Patent Trial and Appeal Board in its finding that the quote interposing claims are non-obvious based on the combination of Ligon with Munichhoff or Barma. It really comes down to two issues raised in the obviousness section, the inoperability section and the teaching away section that we'll focus on. As to inoperability, the board based its conclusion on an erroneous standard bodily incorporation rather than what the combined art of teaching suggests to a person of ordinary skill with common sense and creativity. And then in addition, the board lacked substantial evidence based on I think an ambiguous error in the record regarding quote new to Q. Secondly, we'll talk about the teaching away that the board used an inappropriate standard there as well. They asked Shaw to disprove Ligon's primary objective of minimizing sharp changes in direction rather than applying the correct test of accounting for the entirety of the prior arts teachings. In addition, the board lacked substantial evidence in that instance. On your inoperability point, does it hinge on Dr. Wang? Do we have to conclude that Dr. Wang was timely in order to find in your favor? We don't have to. We certainly should and I'm happy to talk about that. But Dr. Wang adequately in his outgoing, in his initial declaration, put forth everything that was necessary to satisfy the prima facie case based on the record at that point. But what did he say about why a skilled artisan would have been motivated to use tubes and reverse the sequence of packaging? So we're focusing in our brief on figure one and that's in the reply. In the initial brief, what he talks about in his declaration is he explains that the motivation to combine is to increase the continuous run time of yarn packages by tying them together. But the tubes, where's the motivation come to use the tubes? Use the tubes or reverse the sequence of the packages. That's what he testified to, didn't he? He explained that's what would happen? Right. It just felt like a lot of hindsight to me, so I'm trying to understand where the motive, I know you're saying no, no, no, it's definitely not hindsight, but I get that. Why? Where's the motivation? The motivation to combine is plainly stated in Municoff, for starters. The claims that fell in this action, the 13 claims, were on the actual reason for allowing the use of this patent. It had to do with this cart-to-cart transfer. Back in 1984, Municoff came up with this concept that you would unwind a yarn package on one cart and that when it exhausted, rather than having to stop the downstream process, it would switch over to a yarn package on the other cart, continue the flow all the while. And he did that through what the claims talk about, a common guide. The common guide in this instance were the tubes centrally located, mapping exactly to those claims and the basis for their invalidation. Is that tube Q? I'm so glad you asked about tube Q, and I want to focus on that because it is really the anchor upon which the board placed its decision on inoperability, and it was clear error. The board came to the conclusion that we had inserted new structure, a new tube Q. But if you look on page 38 of our brief, we hope that it simply found that the only thing that's new is the letter Q. That tube that we have there, it's been there since 1984 when Municoff first drew it. So if you look on page 38, we merely used the perspective, or rather Dr. Wang did, provided by the side view that shows their spacing apart of tube P, the tube in which the yarn extends to the lower level. And that merely by using that perspective in combination with the overhead view, he was able to do a slice across section to show what we have here in example one, showing plainly that Municoff had solved this issue in the two package arrangement. Of course, he did not wrap it around the center lower extending tube Q. Nobody contested that. That's why there was no response and they let those claims fall. But all of a sudden, the board in its zeal that we had somehow injected new tube Q in pages 22 and 23 of its final written decision over and over and over again, it faults us for having done something that nobody ever accused us of doing. Nobody raised it. It didn't occur to anybody that that was even an issue, that we were talking about some new structure. This is a picture of Municoff. I think Dr. Wang combines features from different embodiments, figure one and figure four, in Municoff. So really, I feel like he picked and chose features from different embodiments in Municoff and doesn't explain why somebody with skill in the art would pick and choose those features and put them together in the kind of way. The claims that fell had a single feature stranding across what we just walked through. The package falls on one side of the car and then it connects to the other. The claims that survived inject a single additional element. They describe it in many words in each of the different claims, but all it does is add a neighboring package. That is one on the same side, thereby doubling the run time. It's plainly admitted in this case that all elements are present. The record says that it is old as dirt to have cross car transfers, that it is old as dirt to have neighboring packages. We have the testimony. We asked Mr. Chadwick, their expert, on page 725. So regarding this, focusing on connecting 30A and 30B together or 30C and 30D together, was that on every stranded creel before you filed the patent application? Answer, yes, ma'am. That's common practice to tie those two together, tip to tail. So we've got cross car connection back since at least 1984. We've got neighboring connection back since Mr. Chadwick puts no earlier deadline on it. And we've got a motivation to combine that they admit to. They admit that the motivation to combine is to increase yarn time. So the only additional element here, the only purported novelty, is that somehow we combine. Well, I don't know what the purported novelty is. And Dr. Wang put forth in his initial declaration that he would merely take what's already been conceded, essentially, as anticipated with the claims that fell, and merely add a known convention of a second neighboring package that people have always done. They talk about this circling, the circling that would create this ensnarement. The claims don't talk about a circling. They talk about a simple, go to claim 6, go to claim 7. They talk about stranding across and then going to a neighboring package. In addition, the tube Q that extends below is never wrapped around. Nobody contested it was in a tube package arrangement. So why would a person of ordinary skill suddenly just shed that knowledge, purge it from their knowledge, and then begin wrapping it around the middle pole? It just doesn't make any sense. So you have to ask yourself, how did the board come to this conclusion that's so illogical? And plainly, it's because they were punishing us for what they thought was new structure. But there was no new structure there. They just didn't appreciate what we think is a very simple argument. And nobody fought us on it. ACS did not complain about that argument. And probably as surprised as we are that it was the basis of the decision. Well, didn't the board say the additional package would be inoperable because of the tangling? I'm sorry. I'm sorry. Didn't the board say the additional package would render the invention inoperable because of the tangling? Yes, they did. You're going on old as dirt. Old as dirt. Add another package. Add another package. The board made a fact finding that adding that additional package would create tangling and the whole thing wouldn't work properly. Well, they did it because they ran down an improper legal standard of requiring bodily incorporation, essentially a time-lapse video to have been made to show exactly how everybody would have stapled everything together, when in fact we had all the pieces together. Where did they require that? You're making all these statements that just don't comport with my understanding of the record. I mean, they sound very compelling if true, but where did they require this time-old improper standard of showing stapling and every little detail? Where is that in the record? Or is that just a turning argument? We think it is the only deduction from a situation where they have all... So you are inferring that that's what they did. They didn't actually use that time-old improper standard that you referred to a second ago. They used bodily incorporation. They did, in fact, as evidenced by the basis upon which they relied to reach this conclusion of inoperability. It's conceded in the record. All elements are shown and the motivation to combine is there. We have the cases that talk about it. The only case in opposition to us is the McGinley case, one where there was a highly contested issue about whether the elements were shown. It was highly contested whether there was a motivation to combine. We compare this. Analogy is helpful with this technology. Could you address also the board's finding of teaching away? Absolutely. Absolutely. So the issue with teaching away is that the board failed to account for the entirety of the teachings of these references, rather putting together a standard for us where we were required to disprove, this is a quote, to disprove Ligon's primary objective of minimizing sharp changes in direction. So this is the argument or the basis. So the issue of sharp changes in direction, that goes to breaking, right? It doesn't go to breaking. Well, excuse me. It goes to breaking of yarn, not breaking of improper ability. That's right. So all of the references, Munichhof, Barmag, Ligon. In this case, the patent teaches continuous run as being the main feature or the purpose of the patent, to achieve continuous run. The 360 patent, right. So when we talk about breakage, are we talking about breakage at certain speeds? All of the patents talk about, when I say all the patents, I mean the prior art as well as the patent at issue, all talk about, at some level, the concern about breakage. The people of ordinary skill in the art should use their common sense and engineering facility to make sure that they don't tie yarn around pieces of machinery so it breaks, for example. Ligon offers a preference, a preference of not turning yarn on what it calls particularly sharp turns, which we say, putting aside that it's undefined. The premise of Ligon is built upon the understanding that it's age old, that people have been apparently turning yarn successfully on particularly sharp turns, whatever that definition is, and we know from Munichhof that 90 degrees was functioning and nobody contested that it wasn't in all the claims that fell. So this teaching away argument, or the basis upon which the board relies, just fails to take into account the entirety of these references teaches. Teaching. This court in the Alcon v. Apatow case found its way to even acknowledging. Let's say you— You're well into your rebuttal time. If you'd like to keep going, you're welcome to. Okay. I'm going to reserve it for rebuttal. Thank you. Mr. Smiley? Mr. Smiley, sorry. Mr. Smiley? Did I have that right? Yes, you did. Okay. Good afternoon, Your Honors. May it please the court. This court looks at the decisions of the Patent Trial Appeal Board for substantial evidence. The final written opinion by the board is very well drafted. It contemplates arguments by the patent owner. It contemplates the arguments set forth by the challenger. And each of the decisions is concluded with rationale. What about tube Q? Was it added structure or not? And if the board finds that it was added structure, or says that it was, but it wasn't, then where is your substantial evidence ground? Your Honor, first, it was not new structure. And before we get to that, Shaw is a victim of their own circumstance. When they filed this IPR, they did exactly what Judge Moore mentioned a minute ago. It was hindsight. They found a laundry list of everything that was in the claims. They asserted it in the IPR, but they never told us how you would put these pieces together. When we responded and we hired our expert and asked him to opine on this, he said, I don't know what to do because how do these puzzle pieces go together? Nothing would work. And we were shooting in the dark the entire case. We submitted quite a few examples of how we thought they may be put together, and then Dr. Brookstein and Mr. Chadwick opined on how they would not operate. When we finally get to the reply declaration of Dr. Wang, which is the point in the case when all the substantial briefing is complete, we can't submit any more briefing, then he finally puts forward this example, which is that tube Q that they referred to. The tube Q is already there, but first he said… He's simply labeling it, in other words. He's labeling something that's already in the device. All of the packages, and Shaw has said this before, they have to point towards the tube that the thread is going up, because you're unspooling some yarn and it has to go towards that tube. In Dr. Wang's example with Q, none of them point towards the tube that they're supposed to. The example doesn't follow anything that he says. He doesn't explain what happens next to those. If you're going to have all four of those, how does the rest of the device work? And you're also fishing it through a tube that's already in Municoff. It's already in BarMag, and it wouldn't be possible to fit that yarn through there and have it operate the way that the 360 patent does. The 360 patent has no tubes that go up through the middle. It's just rings. So they're a victim of their own lack of helping the courts understand how they would put these together, because there is no way to put those together. When we get to the second IPR, we have… Well, would you agree then that there was error in saying that Q was new? If it's interpreted that it's new, there is. We believe that the board was saying the use of it is new. The use of that tube Q is new. To fish it through there like that would be new. And these devices that operate back and forth and the thread is moving very quickly, it would be hard for an operator to reach his hand through there because you've got to tie these things together while the machine is operating. So it's not a new tube at all. But the board does address how it would work or why it would not work. Maybe it's not a new tube, but perhaps it was interpreted to be used in a new way. Yes, yes. Except that what they say is it involves adding a tube Q to the assembly. That seems pretty clear. There's further language where they say the use of it. But you are correct. It is not a new tube to the assembly. If you look at the Municoff reference, there are tubes going up through the center. So again, if we find that the board said it was a new tube to the assembly, then that would be error. It would be error that it's new. They still supported it with substantial evidence of why it would still cause improper… It wouldn't operate that way. None of the packages face the yarn guide eye. They all have to face, point towards that yarn guide eye so they can go up. The way he's drawn it, they would be pulled laterally to the package and the operation would stop. And the board addressed that. The board says that there. That's confusing because I see what you're saying. They say the use of tube Q won't work. But I'm not at all sure that that's not informed by their saying, well, it's a new thing. I think they, well, first they addressed that it came in the case late. And it's prejudiced to us because we couldn't have our expert now file an opinion that you could read and that could explain why that doesn't operate. Was it discussed at oral argument in any fashion? I mentioned it at oral argument, yes. And I pointed out the fact that they've said a couple times now that it's critical, it's absolutely necessary that the spindle that the packages are on face directly at that yarn guide eye so the thread can go up. And I see you have it in front of you there, the drawing. You see none of them, not one of them point towards that yarn guide eye. And if you turn them all to do that, you can no longer go around that Q like they say you could. So there's fundamental problems. If they were going to submit this embodiment, it should have been done in their petition, so it would be in front of us, it would be in front of our expert, and then we could have dealt with it. But because there's issues and they knew that, they put it in the case late, so we're stuck with guessing at what would happen. So AC estimates that each of the points set forth by Shaw was supported by substantial evidence by the board. When we move to the second IPR, we have an entirely different story. This is one of the clearest cases of hindsight I think this court will find. I'd like to start with the bigger, easier to understand concept. In the second IPR, we have three references in play. We have Munikoff, Farmag, and Blum. All three of those patents, and the test here is what would be obvious to someone of skill in the art? Would it be obvious to combine the features of these to someone of skill in the art? Those three references are all owned by the same company, the Farmag Corporation. They've been owned by that corporation for over 30 years. Prior to Shaw submitting, it would be obvious to combine those. Here you have a company that is skill in the art, and they haven't thought of it for 30 years. That should be clear enough evidence that it's not obvious to combine these structures. Number two, we have the fact that Shaw filed his first inter partes review. They hired Dr. Wang, who they deemed as a person of skill in the art. They submitted seven patent references. They submitted a 58-page description of why the claims would be invalid. In the first IPR, it didn't occur to them that Farmag should be used as an obvious combination. I'm sorry, Blum. They didn't think then that Blum should be used as a combination reference. Further evidence that it's not obvious to someone of skill in the art to combine it. It was only after the first IPR rejected Claim 4 as one that was being challenged, that they then went, and we say they went on a scavenger hunt, to try to find anything and any reference that could show what was recited in Claim 4, which is the distance corresponding to. They come back with the reference Blum. Now, Blum is shown in pictures on the final written opinion on page 35. At the very back, I'm sorry, at the appendix, page 35, there's a nice drawing of the Blum reference, figure 3. Shaw asserts this reference, this Blum, and says, the top right corner shows the distance corresponding to, which is what's recited in Claim 4 of the 360 patents. They say that the distance corresponding to, because the package has to swing underneath the horizontal bar labeled as 64. We responded and said, that doesn't make any sense. If you look at the row right below it, that bar is below the package, and it couldn't swing underneath there. And we said, looking at the third row down, it doesn't make sense, because it's even lower. The package would hit that bar and couldn't swing underneath. The board says to us, that doesn't matter. What is in the rest of the drawing, they say, on page 39 of the final written opinion, they say, whether the other disclosures, they're talking about the lower two rows, they say, teach the same distance, is immaterial. That's their opinion. Someone with skill in the art would know to only look at the top right corner and ignore the other two. And hindsight's not supposed to be put in here. We said, it further doesn't make sense that they don't swing underneath. If you could turn to the final written opinion on page 40, they show an error. They say, this shows that the package must swing underneath that bar. That's why the horizontal portion 64 must be higher than the package, so it can swing underneath for loading and unloading. If there's any other important points you want to make on this, please go ahead and do so. But I'd like to ask you a couple of questions about pain and the other arguments related to it, and the writ of mandamus that we have pending in front of us. But I want you to finish this argument completely, so if there's any other important points you want to make on this, go ahead. Yeah, I'll get to them quickly. On page 41, it shows there's a spout hanging down that would not allow the package to swing underneath. It would smack into that package, and it wouldn't operate. So we argue that this Blum reference doesn't teach a height corresponding to the distance of a package. It doesn't show it there. They didn't find in our favor on that, and they say, we're going to now combine what we think is the disclosure of a height corresponding to the distance of a package into Munikoff. But here's the other error. When they did that, they didn't combine the height corresponding to. They added adjustability to Munikoff. Nowhere do they say they're going to add this L-shaped bracket because it has a certain height. They added it because it has this adjustability. We argued back that when you read Blum, and Dr. Wang did not understand Blum, it's in our red brief we have excerpts of his deposition. He didn't understand it. Blum does not teach adjustability. The pieces are fixed. When we argue that, we say, you can't put it with Munikoff because it doesn't teach adjustability. The board says, well, don't worry about that because that's not in your claim. Claim 4 doesn't require adjustability. So it's very confusing. They're trying to invalidate our claim that claims height corresponding to a package with a reference that really doesn't show that. And then they say you embody something different. You embody this adjustability that's not in the claim. And this is all in pages 39 through 41 of the final written opinion. So the problem here is that we still have never seen anywhere in this case a description of how Blum would be actually incorporated with Munikoff or Barming. How would that work? There's been one drawing, but the packages of Munikoff are not shown to swing underneath anything. So there's no distance corresponding to. Somewhere there was a shell game here. We put the L-shaped bracket under a shell. They move them around, and when they lift it up, there's this supposed adjustability portion there. But Blum doesn't adjust. It looks like it does if you read it quickly, but it doesn't. It has a restriction on this tube 64 that Shaw has said is a telescoping tube, and that's why you would move it into Munikoff or Blum. But that telescoping tube has a fixed bar 65 that keeps it from telescoping. When the machine pivots, it pulls that 64 around and telescopes it, but it's not anything you set for an adjustment. 65 moves it around. We explain this very clearly in our gray brief in the first 10 pages. I'm sorry, now you wanted to address Payne? Well, you don't have much time left. I'll take it up, I guess, mostly with the PTO, but I wanted to understand what your argument was on why we shouldn't grant a writ of mandamus and why it was appropriate for the Board to refuse to consider the grounds in light of Payne. Yes, the Patent Office is definitely here to help us with that. The rules grant the Patent Office the ability to bring certain references into IPRs and to deny others as being redundant. What rules grant that? What rules? Let me just see. Title 35, Chapter 31, Section 315 grants the Patent Office, and 314 grants the Patent Office the ability to conduct these IPRs in an efficient manner that they have to be completed within a year. It doesn't say redundant, though, does it? It doesn't say redundant, no. They have the ability to make a determination on whether there's a likelihood that the claims are unpatentable, and this Court does not have jurisdiction to review those decisions by the Director. Well, except that in quosa it expressly leaves open the possibility that mandamus might be an appropriate vehicle for us to think about these issues. Unless it's the discretion of the Director to institute this. Why is it the discretion of the Director to institute? Because the Director has the duty to facilitate these IPRs in a timely manner and to ensure that each of the claims is looked at and that there's a final disposition by that period of time. If they get a complex case, then maybe to meet their deadlines, they need to work harder or more efficiently, but where does the scheme for redundancy come in that allows a PTO to determine which claims are not to hear on the basis that they may be similar to something else? The theory of the IPR is that the petitioner is to assert references that are tangent to the claims at issue, not just submit an entire search report and let the Patent Office do its work. There's been cases where they've submitted 400 patents. But that's not one of those cases. No, it's not one of those cases. It's a case where several references have the exact same theory, the transfer of parts back and forth, one after another. So who decides that they have the same theory? The Director. Well, the Board looks at those references. I didn't see them do that. I understood their redundancy determination to be that there are just too many different grounds of rejection being lodged on the same claims. I didn't understand them to make a factual determination that the reference pain was redundant, for example, if the reference luna canoff or whatever. They said that with respect to those claims, they said the additional sort of grounds are denied as redundant in light of our determination that there's a reasonable likelihood that the challenge claims are unpatentable based on the grounds of unpatentability in which we institute inter partes review. Right. I don't see that statement as standing for a determination by the agency that the disclosure in pain is redundant of the disclosure in luna canoff. I'm not saying it right, I know. Yes. I understood that to be more, well, we'll ask the PTO. They're here, so why don't we ask them? They probably are a little better prepared to address this. So why don't we have the PTO come forth and explain this to us. May it please the Court. Good afternoon, Your Honors. Just before I answer the specific question you had about redundancy and where that comes from, I'd just like to start by saying that this court lacks jurisdiction to review the USPTO's decision to institute the IPRs in this appeal. The determination by the director, whether or not the court in Cuozo expressly leave open, was it Cuozo, I think, that left open the possibility of a writ of mandamus being entertained? I'm not sure how or why it fits in the rubric, but it did leave it open expressly. So what Cuozo basically was saying is that it didn't decide the issue, but there are instances where possibly a writ of mandamus would be appropriate. But you also have to look at St. Jude and Dominion Dealer, which talked about a writ of mandamus would not be appropriate when there is a decision not to institute, when there's a denial of an institution decision that can't be challenged even by way of mandamus. And what you have here is an effort to institute grounds that we denied on. So in essence... Explain to me, if you would, the response to the question that I proposed to counsel, which is I understood the redundancy decision by the PTO not to be a substantive decision that Payne, that reference, was redundant of these other references, but rather, and I think it's important, it's important for estoppel purposes, it's important so that later in a district court litigation, if somebody tries to argue Payne, that they can't then bring out this redundancy and say, no, no, PTO already disregarded this. They found Payne factually redundant of Munikanov or whatever it is, and therefore district court, you should reject it too. You see why it's important. It's very important that exactly what the PTO meant by redundancy be made clear. So what exactly did they mean? I understood it to mean redundant in terms of too many different grounds of rejection. We're going to only decide these. We're not expressing any indication or decision regarding the validity of these others. Your understanding is correct, Your Honor. When the board said that the grounds were redundant, they weren't talking about cumulative or something of that nature. They were basically just trying to say, we've already found that we can go forward on this particular claim under one theory. We don't have to go forward on that same claim under multiple theories. Even though those other theories might be totally different and the Payne reference might disclose very different things. That is correct, Your Honor. So for our purposes, and we talked about this in our brief, although we don't think it's right here, we wouldn't find a stoppel on that Payne-based ground because we didn't institute on it. Just to further follow what you said about it's important to know because the district court would need to understand. We simply are saying we are going to institute on these particular grounds, and the reason why we didn't institute on these grounds is because we didn't feel that we needed to. I know that your primary argument is, I don't have the authority to review the decision, right? And I get that. But let me just ask you a few questions about whether or not the decision was made in a very intelligent way. Can you please, because you all brought a case to me, Hyatt. Are you familiar with this case? I decided it in your favor, right? And in this Hyatt case, you asked Mr. Hyatt, you said, I'm going to limit you to X number of claims. If you need more than that, tell us why. We think these claims are representative of all your arguments. And you did, the PTO did a really great job of putting the onus back on the person seeking this excessive amount of stuff to justify which things were the most important. But what seems to be occurring here in this process is the PTO is putting a blindfold on and throwing darts at the wall and deciding which grounds to go forward with. I see no rhyme, reason, or logic in the decisions made. And so whether I have jurisdiction to review it or not, aside. Can you look at page A90 of the appendix? Page A90 contains the grounds that were lodged. Give me one second, please, Your Honor. Sure, of course. Yes, Your Honor. Now, let me be clear. There are two sets of claims at issue in this entire review, and they have been divided nice and neatly and evenly. The interposing claims on the one hand, which are 6, 7, 13, 15, 18, and 21, and the non-interposing claims on the other. Okay? Do you understand what I'm saying so far? I do. Okay. So the PTO decided it wasn't going to look at ground 11, 12, 13, 14, or 15. I notice, and I'm sure you would as well, that the anticipation under pain is the only thing that goes to the interposing claims. Look at anticipation by Munochoff. It's not argued for any of these interposing claims. Look at anticipation by Marmag. It's not argued for the interposing claims. There are two discrete sets of claims that are set apart by an important function or purpose or, I don't know, structure. There's only one ground of rejection of anticipation made on this entire set of claims, and that's the ground the PTO said it wasn't going to reach because it's redundant. Instead, what did it do? Ah, it instead decided to choose one of the obviousness grounds based on the accumulation of, like, 15 different references. Three, to be honest, not 15. But you get my point. I understand. So I guess what I'm wondering is whether I can reach it or not, does it seem like anybody put any thought at all into deciding that pain would be redundant and that the whole world would be better served when there are only 15 grounds of rejection lodged by the agency choosing which ones to go forward with and clearly not choosing the strongest one for this entire set of claims? Your Honor, my response to that is that in instituting these IPRs, the board has to look at IPRs as a whole, and we, for efficiency reasons, have to get these completed within a year. Isn't anticipation something more easily reviewed than obviousness? It's just how technical it would be based on my exposure to cases. Right, Your Honor, but just sort of to answer you whether or not this makes sense or not, the board has to do what it feels is best considering what it has in front of it. So tell me why this would be best. Give me any logical reason why you think this decision that it made in this case makes any sense and leaves them better off or the world better off. Well, as we said in our brief, the board said, look, we've already instituted on this, let's say, Ground 11. We did Ground 5. We don't also need to do Ground 10. No, you didn't institute on Ground 11. No, that's my point. We don't have to institute on Ground 11, but that's anticipation of these claims. There's no other grounds for anticipation of these claims. What I'm saying is, maybe I'm not being clear, so if you look at Ground 11, it's talking about particular claims, 1, 2, 5, 8, 12, and 21. Yes, and all of the interposing claims are contained in those sets. Yes, all the interposing claims, 6, 7, 13, 15, 18, and 21, and that's the only place they appear in any anticipation ground. Well, you're right, under anticipation, but sort of going back to what I said before, what the board is saying is how is it more efficient to look at three reference obviousness for those claims than one reference anticipation? Well, the board found that there is a reasonable likelihood that it could go forth, for example, on Ground 3, which includes 6, 7, and some of those other claims, and says we don't have to find other reasons to go forward on those exact same claims. But then when the board came to the conclusion, as it did in this case, that it was wrong in terms of having reviewed, it was wrong when it said it's more likely than not that these claims are going to be rendered invalid by these references, why not then at least go back to PANE? Or let me ask you this, isn't it true, because I think it is, that they could institute another review right now, you've said they're not a stop, on PANE? Why can't they, can they, institute another IPR right now on PANE and they're not a stop? Are you asking if Shaw can go forth and say, Shaw can put that petition forward and the board can then make a determination on those grounds on a substantive level of reasonable likelihood. Okay, so they're not a stop, definitely not a stop. They're not a stop. So, the answer to their... There would be, there might possibly, and I just have to look at facts, I don't mean to interrupt you, I'm sorry, Your Honor, but if there was any 315B bar, that I just have to factually look, if there was, you have to file within one year of the complaint, so I just, they're not a stop in district court, I don't know factually if they could do that today on the PANE grounds here. So they can't file in series in the PTO then? What I'm saying is I just, I don't know factually what the facts are and when the complaint was filed, I'd have to look at that, but no, if there's... There's not sort of like a tolling by virtue of them having filed it before and you declining to address it, not on the merits? No, Your Honor. But they could go to district court if they wanted to. And if that, and again, I'm not saying that they would be barred, I don't know, but if they weren't, they could try to bring it. But don't you think that there could be a more sensible approach to doing this, kind of like what you all did in Hyatt? I mean, first off, there's only 15 grounds here and there's only three primary references. That's it. And there was anticipation for all three of them. Why in the world you wouldn't go that route? You've indicated nothing about the board's approach being more efficient. Okay? So you've definitely not convinced me of that. And I don't think you're convinced of it, quite honestly. But apart from that, why isn't there a better way to do this, whether I can review it or not? I mean, doesn't it make a heck of a lot more sense? Why don't you turn it back on them and say, you tell us, we're not reviewing all these, you give us your best five. Your Honor, whether or not there's a better way, I can't speak to. What I can tell you is that it's within our discretion, the board's discretion, to institute the IPRs in the way that they see fit and that's promulgated in the AIA under 316 A and B and this is the way they did it here. So in your view, is there such a thing as the redundant doctrine? Does that exist? People have coined it saying the redundant doctrine. No, it does not. The board uses the word redundancy, but there's no redundant doctrine. Basically what they're saying is we've instituted on this claim, we don't need to look at multiple reasons. So just thinking in terms of parties appearing before the CTO and they're trying to establish how they're going to prosecute the case or defend one, and you're saying there's no redundant doctrine, but what about the horizontal analysis, the vertical analysis, the redundancy analysis? There seems to be a lot of institutional structure of something that has been called the redundant doctrine, but you don't want to call it that. Well, the board has never used that term. Parties have said that word. Because you argue in your brief that it doesn't exist. There's no such thing as the redundant doctrine. Right. But yet you're doing something that prevents, in my view, some litigants from asserting, from having their day in court, from having, you're taking away causes of action and I think Judge Moore has illustrated what happens when you do that. There's a complete line of, there's a complete theory that can be undermined by the redundant doctrine. Well, we're preventing them from being able to go forward in a particular IPR. We're not, again, these grounds under our view, they would not be able to. But if we don't know what those grounds are and you haven't laid a basis for them, somebody filing in district court can face an estoppel argument saying that these grounds have already been before the PTO and been found to not be valid. Or that there's been some sort of substantive determination made with respect to those grounds, but we don't know what they are. Well, it's not a substantive determination. We're saying we're not instituting on those grounds. But let's go back. How is it not a substantive determination if you're looking at different claims and saying, well, this one is not a good one. Or it's similar to this one. Or let's not prosecute on this one because if we decide this particular ground, then it eliminates everything else. The problem is I personally don't see how you're making these decisions. And I do know that the Constitution grants litigants the right to, well, under the AIA, the right to this particular proceeding, but in the district court, the right to a jury. And my fear is that your redundant doctrine that doesn't exist is doing exactly that. So to address what you're saying, this is not a substantive finding on those particular grounds. In fact, it's quite the opposite. What we're saying is for efficiency reasons, to streamline the proceedings that have to be done within a year, we are choosing to institute on part of the grounds that were presented in a petition, but not all of the grounds that were presented in a petition. The parties are not stopped or prevented from arguing those grounds. It's just not going to go forward in the particular petition. Well, no, the parties are stopped from arguing those grounds in the PCO because it is more than a year out. So there is a stop all year. They could go to the district court. They wouldn't be stopped from arguing those same grounds at a district court level where they'd have a jury that can decide. We're just saying you can't do it here because we're not going to institute on it. We're not giving you a reason. We're not saying there's not a reasonable likelihood with respect to them. We're not making a substantive call. We're just... And just to point out, we don't even... Does suppression to decide what's in the efficiency of service allow for disparate treatment of disparate parties? Of the same parties, I should say. Disparate parties, I guess, yes. They can be treated differently. But to understand, meaning... This is a case. There are 15 grounds. There's only three references argued for anticipation. I've seen lots of IPRs come up already where there's 30 grounds and the PTO resolves all of them. What if on the same day this determination was made? Nope, we're only going to do 10 of yours. There's another determination where they go ahead and review all 30. Is that okay? Is it an exercise of discretion to allow the agency to make different decisions in different cases like that? Yes, because factually we don't know what's going on in those cases. Just because a case has less even references or claims doesn't mean it's not more complicated and would take more than a year. Some cases, the technology is so different. You're basically comparing apples to oranges. We can't just look at how many claims and how many references are in there. Some can go quickly, some may not. The point that the PTO is trying to say is we have to get these cases out. We have a year to do this. What do you decide on? The claims or the grounds that are more complex or the ones that will resolve the case? I'm sorry, Your Honor. I just didn't hear the beginning of your question. Okay. On what's the basis of the decisions being made that something is redundant? Are you selecting the claims or the grounds that are the most complex and that's what you want to deal with or the ones that will resolve the entire case? The Board is choosing to look at the petition as a whole and make a call on to what would be the most efficient for that particular petition. The reason I'm not specifically answering what they decide is because it could be different for the varying petitions that come forward. Just listening to your arguments and trying to figure it out, I'm having a hard time seeing how you're not making substantive decisions with respect to particular claims. Because you're not deciding that the particular ground that you're choosing not to institute on doesn't have a reasonable likelihood of success. We don't even have to state in our decisions, our institution decisions, why we're choosing not to go forward. They happen to do it here and use the word redundancy. But they could have simply just said we're going to institute on grounds XYZ and said nothing else. Suppose they said we're not going to institute because we don't like your company, period. Suppose that they clearly went offline and indicated they were refusing to institute for a reason that would not be viewed as even vaguely or plausibly reasonable or within, I would think, within the delegated authority given to them by Congress to promote the efficiency of whatever, whatever, whatever. Your question is if they did that, what would happen? Would that be a case where we could review it? That would be a case that you could choose to possibly... Be an improper motive case. Possibly. If there are constitutional implications. Right. If there are constitutional implications, then obviously you can. That's not the case here. Suppose there's only one claim, one ground, and you look at it and go, whoa, this is a really difficult, complex claim we're not going to institute. We actually have authority to do that. If you look at the legislative history and comments made by Senator Kyle, they even put in provisions where if for efficiency reasons there is a claim that even has a reasonable likelihood of success going forward, we can deny to institute on that claim. That is within our discretion to do. It's not something that usually happens, but it is permissible. Where does it say that? Does it say that in Section 316? No, it doesn't say it in Section 3... Just give me one second. Kyle says it in the legislative history. Yeah, in the legislative history, Senator Kyle's legislative history, especially statements made by an individual senator. So where does the statute give the... Well, the statute gives us authority to institute... So if you look at 316A and 316B, that's where we get our authority to go forward under 37 CFR 42.108. And so at 316... Okay, so at 316A-2, I'm going to help you. I'm going to get you right to the point. Setting forth the standards for showing sufficient grounds to institute a review... Okay, and you've set them forth and you've said more likely than not. Invalid, right? Isn't that the standard that you set forth? Yes, and then if you look at 316A-4, we also can establish and govern inter-parties review under this chapter, so that gives us authority to do it. And then if you also look at 316B, we can take into consideration the... Imprescribing regulation. Right, which is then 37 CFR 42.108, which allows us to institute on some grounds, not other grounds. Okay, wait, but you're allowed imprescribing regulations to take these things into account, and you're saying that your regulation 42... What is it? 37 CFR 42.108. Okay, and that's the one that allows you... Tell me exactly what that says. That allows us to institute on some grounds and not others, to parse out a petition, what we did here, to say I'll institute on... Does it give a reason for parsing? Because, I mean, I think I'm sort of with Judge Reyna, which is your redundancy... You could see why I was confused. I was confused in the very beginning. Were you making a determination that pain itself was redundant of the other references? Were you just deciding grounds? I'm a little concerned by the PTO's explanation and the effect it may have, the lack of clarity in your decision, in this case, and what effect it might have. So what does it say precisely, that regulation you can do? Sure. So the regulation reads that at any time... I'm sorry. Let me start at A. When instituting inter-parties review, the board may authorize the review to proceed on all or some of the challenge claims and on all or some of the grounds of unpatentability asserted for each claim. And then under B, it says that any time prior to institution of inter-parties review, the board may deny some or all grounds for unpatentability for some or all of the challenge claims, and that denial of a ground is a board decision not to institute inter-parties review on that ground. Isn't that assuming that they've actually looked at the claims and made some decision as to its likelihood? I mean, in here, under the redundancy doctrine, it appears that a lot of the claims aren't considered at all. There's some decision that's being made. We're going to institute on these three but nothing else. Well, I wouldn't say that it's not that they're considered. I mean, the board is going to do their job and look at all the claims, but what they're saying is we don't have to consider every possible reason why... Well, then, would you really consider another petition on pain if that's the case? I mean, haven't you already looked at the anticipation argument in this case? Would you really accept another petition just solely on pain? Well, just sort of back up for... In the facts of this case, we wouldn't be able to, but let's say factually that we even could. To answer your question, they may be choosing not to go forward on pain for reasons other than reasonable likelihood of success. They could be choosing not to go forward on the pain ground because they already have decided that the claim that pain is covering in the petition already has one theory applied to it or two theories applied to it. That's a substantive decision. I would argue that a substantive decision is deciding... So you're no longer arguing efficiency. Now you're arguing that this case, we don't have to decide because we've already decided or we can decide it. We can decide this ground on this particular ground. Well, that's efficiency because you're saying we already have one theory applied to claim one just to pick a claim. So we don't need to consider five other reasons and references as to claim one. That's where the efficiency is coming in. Because they're similar? They express the same facts? Because we've already picked one. Because it would take more time to look at four reasons versus one reason. That's the argument that I'm trying to make. So I just want to remind this court, I know we've sort of talked about redundancy and whether or not it produces discretion, but I just want to remind this court that this court has already decided whether or not the institution's decision can be reviewed under Clouseau and St. Jude and Dominion-Dealer and Acades as well, which goes to both of the arguments that ACF and Schott were making in their briefs to this court. So I respectfully ask that you dismiss the questions relating to the reviewability of our institution decisions. Okay, thank you. No, thank you very much. Thank you. Mr. Kotisch, you have a few minutes left for rebuttal. Thank you, Your Honor, and may it please the court. By and large, we're resting on our briefs on the issue of redundancy other than to say that I sense the tenor of the panel is exactly consistent with the lack of equity, the arbitrary and capricious nature of dispatching our sole 102 argument in the name of some apparent substantive look, which now is plainly admitted not to have happened. Would you be able to bring that argument, the 102 argument, in district court and not be a stop? Our belief is that we will, but... You will be able to? Our belief is that we will, but we'll get there, and I think it's a fair prediction that somebody on the other side may say that I am a stop, and we will fight on that battle that the ACS may say that we're a stop, and there'll be an outcome by the district court judge, and one side or the other will have a complaint that we'll be back here in umpteen years to talk about whether we were a stop or not. Perhaps there'll be another case... The government's consistently taking the position that you're not a stop. And we're encouraged by that, and that's why I'm going to move on to some other questions. Liberty Mutual is the case that talks about 220 references. This is a handful, and one 102 in particular. The other points I want to make quickly is responding to the IPR-2, the Bloom reference, there's no error of law even to talk about there. There certainly was substantial evidence. The board said that this limitation corresponding to the distance of the package was shown plain as day on all three levels of the Bloom reference, and then they felt and suspended it with this motivation to combine based on the adjustability of that device and the benefits that would flow if combined with Munich-Hoff. So that's the end of the argument with respect to Bloom. So I want to return quickly to a couple of points with respect to the IPR-2. I did hear one misconception that it's a three-reference obviousness case. I want to make sure, Judge Morgan, you understand that it's two alternatives. No, it's actually, well, it's three secondary references. One primary reference and then three different obviousness arguments with regard to each of one secondary reference. Just to confirm we're on the same page, it's Bar-Mag plus Ligon, Munich-Hoff plus Ligon. Okay, great. And then the use of tube Q is new argument. I think I sense agreement on that, Judge Walk. I don't know what that means. The use of tube Q, the board linked its decision on page 22 and 23 to the fact that it had the misconception that we all admit here openly that the tube Q was new, and as a result, turned a blind eye to our arguments. They excluded the Wang Declaration. Note that in IPR-2... Wang was excluded because it was untimely. That's what they said. It doesn't have anything to do with whether or not the tube is new. But I submit that the reason was the tube Q because if you look at IPR-2, Wang did the exact same thing. He proffered an explanation, a diagram of how Munich-Hoff and Balloon might be combined. He did it at the same time in a reply declaration. No problem. No exclusion made. It was all linked to this tube Q that gave them such heartache. And to be clear, the use of tube Q, I mean, that tube Q was used in the two-package arrangement. There was no ensnarement. That's why they waved the white flag on those claims because people knew enough that when you move from a... I think they draw a distinction between the new tube and the new analysis in Wang. It's not just a new tube. They're saying there's new analysis as well. I don't follow that from what they're saying. It's given that they're stranding across. It's given that they're stranding on the same side. What they're essentially saying is that a person of ordinary skill, let's say the image is a shoe, a shoe with two eyelets, that a person of ordinary skill would have solved the problem, hey, I'll take my lace, I'll tie the shoe together. Add four eyelets, suddenly I dispatch my common sense and I begin wrapping the laces around the underside, the sole of the shoe, so that it breaks, we trip, we fall down. That's essentially what happened here, and we were condemned because they wrongly thought... You're on strong ground. As far as I'm concerned, you're on strong ground for when they say there's no basis for adding the additional tube. I mean, they are saying he's adding an additional tube. They're not just saying he's relabeling. Right, which is all he did. Okay, well, you're well beyond your rebuttal time, so we're going to have to bring this to a close. I thank all counsel for their arguments. It was especially helpful, by the way, to have the PPO here, so thank you for coming and sharing your views with us. We'll take the case under submission.